UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank SCIORTINO, Defendant-Appellant.

No. 616, Docket 78–1415.

United States Court of Appeals,
Second Circuit.

Argued Feb. 8, 1979.

Decided June 29, 1979.

Arnold E. Wallach, New York City (Harold Borg, Kew Gardens, N. Y., on brief), for defendant-appellant.

Neil Jon Firetog, Sp. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y.; Thomas P. Puccio, Attorney-in-Charge, U. S. Dept. of Justice, Organized Crime Strike Force, E. D. N. Y., Brooklyn, N. Y., on brief), for plaintiff-appellee.

Before WATERMAN, MANSFIELD and TIMBERS, Circuit Judges.

PER CURIAM:

This appeal is from a judgment entered after a jury trial in the United States District Court for the Eastern District of New York, George C. Pratt, District Judge. Appellant was convicted on two counts for having violated the National Stolen Property Act, 18 U.S.C. § 2314 (1970).

In count one he was charged with transporting in interstate commerce securities valued at more than $5,000, knowing them to have been stolen, converted, or taken by fraud (§ 2314, ¶ 1); and in count two he was charged with transporting in interstate commerce forged securities, knowing them to have been forged (§ 2314, ¶ 3).

Following his conviction, the court sentenced appellant on count one to a two-year term of imprisonment and a $5,000 fine; and on count two to a five-year term of imprisonment, execution of which was suspended and appellant was placed on probation for one month following his release from imprisonment under count one.

We affirm the judgment of conviction on count one, but we reverse the judgment of conviction on count two. The sentence im-

posed on count one will remain as imposed, for we find no "spill-over" from the sentence on count two which could have affected in any way the sentence on count one.

Briefly, the facts are as follows: In June 1976 a fire destroyed a dwelling owned by appellant and Fergus Norton as tenants in common. They owned the property subject to two mortgages held by Frederick Mannillo and one mortgage held by Nicholas Cone. Appellant notified the insurance broker of the fire and submitted the requisite proofs of losses. The claim was settled for approximately $14,000.

In February 1977 three insurance checks were sent to appellant. Two were for the claim made on the June 1976 fire; one was for $13,396.75 and the other for $624.99. The third was in settlement of a prior fire insurance claim made in October 1975 for $298.34. The checks were made out to appellant and Norton and the mortgagees.

On February 14, 1978, all three checks were deposited into the appellant's personal checking account at the Marine Midland Bank in Huntington, New York. The signature on the deposit slip was the appellant's. The backs of the checks bore what appeared to be endorsements of each payee. Testimony established that the appellant's signatures on these checks were genuine but that those of the other payees were forged. Both Norton and Mannillo testified that they had never seen the checks and that they had never given anyone permission or authority to sign their names to the checks.

The checks were drawn by the New Hampshire Insurance Company on the Merchants National Bank of New Hampshire. A bank manager from the Marine Midland Bank testified as to the actual interstate travel of the drafts through the banking system.

■ With reference to count one, that of allegedly transporting in interstate commerce securities valued at more than $5,000 with knowledge that they had been stolen, appellant urges reversal of the judgment below on four grounds: first, that there was no showing of the requisite intent on the part of the appellant, for he was under an honest belief that the property was his or, alternately, he was mistaken as to his authority to cash the checks; second, that, inasmuch as he was owner of the insured property and whatever equities the other payees had in the property were not established, he had a right to the insurance proceeds; third, that the government failed to show that the value of the checks stolen exceeded $5,000; and fourth, that, as a matter of law, the checks were not stolen, converted, or taken by fraud.

We have carefully considered each of these claims and we find no merit in any of them. For example, there was substantial evidence from which the jury could infer, as indeed it did, an unlawful intent on the part of appellant. All the evidence indicates a determined effort by the appellant to keep the facts of the insurance settlement a secret: he did not notify his co-owner or mortgagees of the fire or the insurance checks; Norton's signatures on the proofs of losses were forged; the forged endorsements of the other payees on the insurance checks were written in different styles and in different colored inks; and, unlike the accused in *Gilbert v. United States*, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962), a case upon which appellant relies, there was no indication of agency as to the other endorsements, for here appellant did not endorse the forged signatures by adding to the names so signed the word "trustee" under the mistaken belief in his authority to do so as did the accused in *Gilbert*.

Appellant also asserts a right to all or part of the proceeds of the two checks involved in the indictment and hence claims that the checks were not "stolen" securities within the meaning of section 2314, paragraph 1. The New York statute upon which he relies, however, N. Y. Real Property Law § 254(4) (McKinney 1968), fails to state what appellant claims for it. As the government points out, section 254(4) prescribes a series of steps which appellant has failed to take as prerequisites to any mortgagor's right to the insurance proceeds, such as notifying the mortgagee(s) of the

fire loss and such as serving notice of an intention to repair. As holder of the first and second mortgages, Mannillo was still owed over $19,000 and thus was entitled to the entire amount of the insurance proceeds. Consequently, the $5,000 jurisdictional prerequisite under the first count was established. Apart from the claim that he had a legal right to the proceeds, appellant offers no explanation as to why the checks were not "stolen," in the very broad sense of that word which has been held applicable to section 2314, *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir. 1978); *Lyda v. United States*, 279 F.2d 461, 464 (5th Cir. 1960), and which has been used in related statutes. *See, e.g., United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957).

■ With reference to count two, that of allegedly transporting in interstate commerce forged securities with knowledge that they had been forged, appellant contends that, even if he knew the endorsements had been forged, such forgeries did not make an otherwise genuine security a forged security within the meaning of the statute.

This contention is not without merit. The legislative history of 18 U.S.C. § 2314 compels us to conclude, as have the Eighth Circuit in *Streett v. United States*, 331 F.2d 151 (8th Cir. 1964), and the Ninth Circuit in *United States v. Simpson*, 577 F.2d 78 (9th Cir. 1978), that Congress intended the third paragraph of 18 U.S.C. § 2314 to reach only forged securities, not forged endorsements, and that the forgery of an endorsement on a security which is complete and genuine at the time of the forgery does not render the security a forged security within the meaning of the statute. *See United States v. Roby*, 499 F.2d 151 (10th Cir. 1974); *United States v. Boone*, 470 F.2d 908 (4th Cir. 1972); *Pauldino v. United States*, 379 F.2d 170 (10th Cir. 1967).

As originally enacted, section 2314 did not specifically include within its scope the interstate transportation of forged securities,

but extended only to interstate transportation of, *inter alia*, stolen securities of the value of $5,000 or more. National Stolen Property Act of May 22, 1934, ch. 333, 48 Stat. 794 (current version at 18 U.S.C. § 2314, ¶ 1). In 1939, Congress extended coverage to "falsely made, forged, altered, or counterfeited" securities, regardless of value. Act of Aug. 3, 1939, ch. 413, § 1, 53 Stat. 1178 (current version at 18 U.S.C. § 2314, ¶ 3).

It is instructive to note that eight years prior to the 1939 amendment, the U. S. Supreme Court in *Prussian v. United States*, 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610 (1931), interpreted language quite similar to that found in the 1939 amendment and held that an endorsement was not "such a part of the draft as to constitute the forging of the indorsement a forgery of the draft." 282 U.S. at 678, 51 S.Ct. at 224, 75 L.Ed. 610. In light of the *Prussian* precedent, the omission of any reference to endorsements in the third paragraph of section 2314 is significant.

Moreover, in 1968 Congress enacted an amendment extending the coverage of section 2314 to prohibit specifically the transportation with unlawful or fraudulent intent in interstate or foreign commerce of any traveler's check bearing a forged countersignature, regardless of its value. Act of Sept. 28, 1968, Pub.L. 90–535, 82 Stat. 885 (codified at 18 U.S.C. § 2314, ¶ 4). Enacted expressly to overrule the result reached in *Streett v. United States, supra*, the amendment was passed in response to lobbying by the traveler's check industry urging this extension of federal jurisdiction to deal with unlawful activity peculiarly aimed at the traveler's check industry. 1968 U.S. Code Cong. & Admin.News, pp. 3654–3657.

It is apparent from the legislative history that the 1968 amendment represents congressional approval of the *Streett* court's interpretation of the scope of the third paragraph of section 2314 and a congressional intent to overrule the *Streett* principle as to traveler's checks only.[1]

---

1. Opposition to the 1968 amendment was grounded upon a reluctance to overrule the

*Streett* court's correct interpretation of legislative intent and thereby to overburden the feder-

As the *Streett* court pointed out, the legislative history of paragraph three of section 2314 indicates that the $5,000 limitation found in paragraph one was excluded from paragraph three because of the "'probability . . . that the person who manufactured the plate from which the traveler's check or certificate was printed produced a large number of duplicates of the same fraudulent document.' (emphasis omitted)" 331 F.2d at 155. Thus, paragraph three was intended to protect against the actual false making of the securities, and was not intended to protect against fraudulent alterations of the rights of holders of valid documents. This is supported by the clear language of the statute.

As the court in *United States v. Simpson, supra,* stated:

> Forging and false making of a certificate imply, for example, the printing of a bogus certificate or, in the case of a blank check, filling in the amount, payee or other terms necessary to make it a complete security. Once the stock certificate is complete, it is a genuine instrument, albeit capable of being improperly negotiated or transferred by means of forged endorsements. In this respect it differs not from an automobile transferred by means of a forged certificate of title. The security, like the automobile, remains genuine although transferred by means of a forgery.

577 F.2d at 80.

The cases relied upon by the government do not support its position. Although the government is critical of the holding in *Streett,* each of the cases it relies upon to support its claims is distinguishable on its facts in that some element necessary to complete the security itself was forged. *United States v. Di Pietto,* 396 F.2d 283 (7th Cir. 1968), *vacated on other grounds,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, *reh. den.,* 394 U.S. 994, 89 S.Ct. 1451, 22 L.Ed.2d

771 (1969); *United States v. Patten,* 345 F.Supp. 967 (D.Puerto Rico 1972).

Accordingly, we vacate the judgment of conviction on count two below.

■ Appellant's other contentions are without merit. It was proper to introduce the third fire check to establish appellant's intent. Fed.R.Evid. 404(b). Moreover, we hold that the alleged prejudice did not outweigh the check's probative value. Fed.R. Evid. 403; *see, e.g., United States v. Braverman,* 376 F.2d 249, 252 (2d Cir.), *cert. denied,* 389 U.S. 885, 88 S.Ct. 155, 19 L.Ed.2d 182 (1967) (introduction of evidence that defendant cashed 39 counterfeit money orders, although on trial for transporting six counterfeit money orders in foreign commerce, to show knowledge of counterfeit nature, *held* permissible); *United States v. Robinson,* 560 F.2d 507 (2d Cir. 1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978) (introduction of gun to establish bank robbery defendant's identity and opportunity, *held* permissible). In any event, nothing even approaching a showing of abuse of discretion has been made out here, *United States v. Williams,* 577 F.2d 188, 193 (2d Cir.), *cert. denied,* 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978); *United States v. Robinson, supra,* 560 F.2d at 514–16.

■ There was adequate proof of movement of the checks in interstate commerce. Merely depositing an out-of-state check for collection is sufficient. *Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954).

Conviction on count one affirmed. Conviction on count two vacated. Sentence on count one remains as imposed.

al judiciary and law enforcement officials with cases involving the forged countersigning of *small* denominations of traveler's checks. Those involving amounts of $5,000 or more would clearly be covered under section 2314, paragraph 1; those involving amounts of less than $5,000 could be adequately prosecuted under state laws against larceny and forgery (minority views of Robert McClory on S. 1440, U.S.Code Cong. & Admin.News, pp. 3656–3657).